# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| BEVERLY ZYLSTRA and | ) | |
| BERNARD ZYLSTRA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-266 |
| | ) | |
| DRV, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment filed by Defendant

DRV, LLC (ECF 22). Plaintiffs Beverly and Bernard Zylstra filed a response in opposition (ECF

28) and DRV filed a reply (ECF 34). Also pending before the Court is the Plaintiffs' Motion to

Strike (ECF 35), to which DRV filed a response (ECF 36) and the Zylstras filed a reply (ECF

39). The motion for summary judgment was fully briefed on April 3, 2020, and the motion to

strike was fully briefed on April 22, so both motions are ripe for resolution. For the reasons

explained below, the motion for summary judgment is GRANTED and the motion to strike is

DENIED AS MOOT.

## BACKGROUND

In March of 2017, Beverly and Bernard Zylstra purchased a 2016 DRV Mobile Suites

recreational travel trailer (the "RV"). The Zylstras allege in their Complaint that the RV had

numerous problems and defects, which they discovered soon after they took delivery and which

they allege DRV failed to repair thereby breaching the warranty terms. This case is fact intensive,

a common characteristic of RV breach of warranty cases. For that reason, a rather lengthy

presentation of the underlying facts, claims and defenses is necessary to set the stage, beginning with the Plaintiffs' Complaint.

The Zylstras state that "[t]his case involves a defective 2016 DRV Mobile Suites recreational vehicle that Defendant warranted and contracted to warrant but which it was not able to repair within a reasonable number of chances or a reasonable amount of time and whose warranty and/or contract Defendant breached. Complaint, p. 2. The Zylstras contend that the RV had nearly three dozen defects or problems that DRV allegedly failed to remedy. Their Complaint alleges the following:

> 19. Because of the contract and/or warranty-covered defects, Plaintiffs notified Defendant and/or one of its authorized servicing dealers of the numerous defects and on various dates delivered the motor coach into the possession of Defendant and/or one of its authorized servicing dealers at their cost and/or expense beginning shortly after the sale.
>
> 20. The RV went into the factory warranty authorized repair shop on April 29, 2017 for about 22 days for repair of the following defects:
>
> • Gray Tank Valve Not Closing;
> • Over Air Antenna Showing Codes;
> • Right Rear Storage Compartment Leaks;
> • Door Hold Missing Screw in Overhead Compartment;
> • Kitchen Drawer Slides Not Working Properly;
> • Main Door Mechanism Pinched/Broken Ribbon Cable;
> • Fireplace LED Readout Doesn't Show Numbers Correctly;
> • Fireplace Remote Heat Button Inoperative;
> • Toilet Valve Leaks;
> • Microwave Installed Crooked;
> • TV Installed Crooked;
> • Quarter Round on Stair Loose;
> • Batteries Do Not Hold Charge;
> • Grease Cap Broken;
> • Hub Cap Missing;
> • Bathroom Drains Slow;
> • Kitchen Light Cover Missing;
> • Gas Lift Arms on D/S Basement Door Weak.

21. The RV went into the DRV, LLC factory repair shop on June 21, 2017 for about 2 days for repair and replacement of the following defect:

• Damaged roof.

22. The RV went into the factory warranty authorized repair shop on June 27, 2017 for about 51 days for repair of the following defects:

• Gray Tank Valve Not Closing;
• Over Air Antenna Showing Codes;
• Right Rear Storage Compartment Leaks;
• Door Hold Missing Screw in Overhead Compartment;
• Kitchen Drawer Slides Not Working Properly;
• Main Door Mechanism Pinched/Broken Ribbon Cable;
• Fireplace LED Readout Doesn't Show Numbers Correctly;
• Fireplace Remote Heat Button Inoperative;
• Toilet Valve Leaks, Microwave Installed Crooked;
• TV Installed Crooked, Quarter Round on Stair Loose;
• Batteries Do Not Hold Charge;
• Grease Cap Broken;
• Hub Cap Missing;
• Bathroom Drains Slow;
• Kitchen Light Cover Missing;
• Gas Lift Arms on D/S Basement Door Weak.

23. The RV went into the factory warranty authorized repair shop on September 11, 2017 for about 102 days for repair of the following defects:

• Vent in Bathroom Tries to Close When Already Closed;
• Fresh Water Tank Indicator Inop;
• LP Detector Panel Not Calibrated;
• Ceiling Light Cover Loose;
• Molding in Walk In Closet Not Attached;
• Over Air Antenna Showing Codes;
• Door Hold Will Not Stay Open;
• Quarter Round on Pantry Loose;
• 7 Way Plug Cover Broken;
• AM Radio Reception Poor;
• Black Holding Tank Hard to Close;
• Black Holding Tank Leaks;
• Bedroom Drawer Not Closing;
• Gas Switch on Range Opens When Range Top Open;
• Vent Cap Loose.

3

24. The RV went into the factory warranty authorized repair shop on January 26, 2018 for about 1 day for repair of the following defect:

• Gaskets replaced.

25. Following the last repair, many of the defects are still not fixed, or were not fixed within a reasonable amount of time or within a reasonable number of repair attempts, and the following new defects have arisen: the leveling system does not work properly and the power cord door latch is cracked.
. . .

28. After being in the repair shop multiple times and being out of service a total of about 176 days or more in the first 10 months and accumulating about 32 or more warranty-covered defects since its acquisition, Plaintiffs notified Defendant that they wanted their money back but Defendant would not do that.

*Id.*, pp. 5-7.

Based on the foregoing assertions, the Zylstras brought suit against DRV for 1) "breach of

warranty and/or contract" (*id.*, pp. 2-10), "violation of its obligations under the Magnuson Moss

Warranty Act, 15 U.S.C. 2301, *et seq.*" (*id.*, p. 10), and a "claim . . . for violation of applicable

state Udap laws, being the Indiana Deceptive Consumer Sales Act, IC 24-5 *et seq.* and/or the

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, and/or

Texas Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code §17.01 *et*

*seq.*, and/or Iowa Consumer Fraud Act, Iowa Code § 714.16 *et seq.*" (*id.*, pp. 11-13).[1]

---

[1] "The Magnuson-Moss Warranty Act is a federal statute that, among other things, permits consumers to sue to enforce state law warranty obligations." *Mathews v. REV Recreation Group, Inc.*, 931 F.3d 619, 621, n. 4 (7th Cir. 2019) (citing 15 U.S.C. § 2310(d)(1)). "'[F]or all practical purposes, the MMWA operates as a gloss on . . . state law breach of warranty claims.'" *Kuberski v. Allied Recreational Grp., Inc.*, 2019 WL 3802453, at *3 (N.D. Ind. Aug. 12, 2019) (quoting *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781 (7th Cir. 2011)). "The disposition of the state law warranty claims determines the disposition of the MMWA claims." *Id.* (citing *Schiesser v. Ford Motor Co.*, 2016 WL 6395457, at *4 (N.D. Ill. Oct. 28, 2016) ("The ability to sustain a cause of action under the Magnuson-Moss Act is dependent on the existence of an underlying viable state-law warranty claim."); *see also*, *In re Gen. Motors Corp. Dex-Cool Products Liab. Litig.*, 241 F.R.D. 305, 315 (S.D. Ill. 2007) (holding that the MMWA "in

In Defendant's memorandum in support of its motion, DRV presents its side of the story, arguing that it did not breach any warranty terms because the Zylstras never afforded DRV reasonable opportunities to repair the problems. DRV also contends that many of the problems or defects the Zylstras list were not even covered under the warranty. Therefore, argues DRV, the Zyzlstras fail to establish an essential element of their claims. The following recitation of facts comes from DRV's Statement of Undisputed Facts presented in its Memorandum in Support.

"DRV was the final stage assembler of the RV and provided a limited warranty covering certain portions of the RV." Defendant's Memorandum in Support, p. 1. The Zylstras purchased the RV from Bradley Bourbonnais Chevrolet, Hyundai and RV Center in Bourbonnais, Illinois, for $86,900. *Id*., p. 2. The Zylstras picked up the RV on April 27, 2017, and went camping for two days. When they picked up their new RV, a copy of the Limited Warranty and the owner's manual were in the vehicle. *Id*., p. 3. During this initial camping trip, the Zylstras, who had prior experience owning an RV, "made a list of things they felt were not working correctly with their RV." *Id*., p. 3. Following this initial trip, the Zylstras "dropped their RV off at Bradley Bourbonnais at the end of a weekend along with a list of the items they wanted to have fixed." *Id*., pp. 3-4. "On Monday or Tuesday the following week, a representative of Bradley Bourbonnais called Mr. Zylstra and indicated that there was damage to the radius area on the roof of the RV. . . . The dealership denied that the damage had happened on their lot. . . . Mr. Zylstra believed the damage occurred while on their lot. . . . Either way, the issue was not a warranty issue and, ultimately, the Zylstras decided to submit the claim for damage through their insurance

numerous respects is essentially a vehicle for vindicating state-law warranty claims in federal court.").

and it was covered." *Id.*, p. 4. "The Zylstras delivered the RV to DRV's service facility in Indiana to have the roof replaced between June 21st and June 24th, 2017." *Id.* "The Zylstras then made arrangements with Plaza RV, an authorized dealer in Iowa, to have their initial list of warranty issues addressed . . . [and] dropped the RV off at Plaza RV on June 27, 2017." *Id.* "In addition to requesting the warranty repairs, the Zylstras made arrangements for non-warranty work to be performed by Plaza RV, including the installation of some after-market items. . . . Plaza RV completed repairs and the Zylstras made arrangements to pick up the RV on August 16, 2017. The Zylstras did not go through their list of repairs with anybody at that time–they simply picked up their RV." *Id.*, pp. 4-5. The Zylstras then went camping in the RV for 11 days. "The purpose of the trip was to go through the RV and make sure everything was working . . . because the Zylstras had a long trip to Texas planned for the first of the year and wanted 'to make sure everything was ready to go for that trip.'" *Id.*, p. 5 (quoting Deposition of Bernard Zylstra, Exh. A (ECF __), p. 59). During this trip, "[t]he Zylstras created a second list of issues they found . . . [and] made arrangements to drop off their RV with Plaza RV in September and did so. . . . Only one item that was on the Zylstra's first list was also on their second list. . . . The one 'repeat' item was an adjustment to an overhead cabinet door. . . . As to that issue, the Zylstras do not know whether Plaza RV properly understood the problem complained of the first time or had attempted repairs on the correct cabinet. And the Zylstras, once again, did not get into the RV and show Plaza RV the nature of the issue–they just stood in the shop and talked about the problems when Mr. Zylstra dropped the RV off." *Id.* (citations to record omitted). The RV was at Plaza from September until December 21, 2017, at which time the Zylstras picked it up, placed in storage for one week, and then embarked on their trip to Texas. During this trip, the Zylstras "discovered a

6

leak in the valve to the black (waste) tank of the RV. . . . Mr. Zylstra called and paid a mobile RV repair technician to fix the valve and stop the leak. . . . The Zylstras never requested DRV pay this fee." *Id*., p. 6. At this point, "[t]he Zylstras did not feel confident that DRV would be able to resolve the issue and decided not to schedule any kind of repairs with DRV or anyone else to address the issues. . . . The two lists the Zylstras gave to Plaza RV in June and September 2017 are the only repairs requested by the Zylstras as to their RV. . . . Since August of 2018, the RV has been in storage except for a trip to Texas for an inspection by one of Plaintiffs' experts and a local trip in Iowa for DRV's expert inspection." *Id*. (citing Bernard Zylstra Depo., ECF No. 23-1, pp. 76-77). DRV states that "[a]t the time they purchased the RV, the Zylstras also purchased an extended four year warranty administered by a third party. . . . That extended warranty remains in effect as of October 22, 2019[,] but the Zylstras have not attempted to mitigate any damages by making any claims under that warranty either." *Id*., p. 7 (quoting Exhibit A, pp. 30-31). DRV states that after filing their Complaint in this case on August 27, 2018, the Zylstras "retained the services of several experts, including an expert to provide opinions on the existence of issues in the RV, Rodney Simmons. Mr. Simmons discusses 23 potential issues with the RV in his report as currently existing in the RV. . . . Mr. Simmons opines that each of the issues he identifies as existing in the RV can be repaired. *Id*., pp. 6-7.

In summary, DRV contends that it never breached any warranty terms because the Zylstras never afforded DRV (or Plaza RV or another *authorized* repair shop) adequate opportunities to address and repair the many issues the Zylstras claim existed with the RV. According to DRV, it "did not breach the limited warranty as a matter of law because Plaintiffs did not provide a reasonable opportunity to cure." *Id*., p. 10. DRV insists that "because no

reasonable opportunity has been afforded for repair, as a matter of law, summary judgment is appropriate." *Id.*, p. 12. In addition to the alleged lack of opportunity to cure, DRV insists that many of the problems with the RV that the Zylstras (or their expert) identified were not covered by the warranty anyway, and so cannot form the basis for any breach of warranty claim. *Id.*, pp. 13-18.

The parties' briefs focus primarily on arguments about the number of times the RV was in for service and for how long. While this is a factual dispute, it is resolved on the evidence and does not require submission to a jury. The Zylstras insist that the RV was serviced six times, while DRV contends that "[t]he two lists the Zylstras gave to Plaza RV in June and September 2017 are the only repairs requested by the Zylstras as to their RV."  While that factual dispute is complicated by the Zylstras' use of questionable arithmetic (as the Court will explain below), the dispositive issue before the Court is straightforward, to wit: whether the Zylstras afforded DRV, or another authorized repair shop, reasonable opportunities to repair the alleged warranty issues.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome

of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

A party opposing summary judgment may not rely merely on allegations in its pleadings, but must "marshal and present the court with evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2001). Summary judgment "is the put up or shut up moment in a lawsuit[.]" *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citations omitted). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## DISCUSSION

DRV argues it is entitled to summary judgment on all of the Zylstra's claims. DRV insists that it fixed any problems with the RV that were presented to it for repair (or more precisely, presented to Plaza RV, an authorized servicer), but that the majority of defects the Zylstras complain about were never presented to DRV so the company had no opportunity to repair them. DRV's argument is summarized in the following paragraph:

> Plaintiffs' complaint asserts DRV breached its warranty and, in doing so, violated the Magnuson Moss Warranty Act and consumer protection statutes of Indiana, Illinois, Iowa and/or Texas. After the lawsuit was filed, the Plaintiffs hired three expert witnesses and now allege the existence of other new issues that were, like the black tank valve leak, not presented to DRV or an authorized dealer for repairs during the warranty. But, to sustain a claim for breach of warranty, Plaintiffs must have given DRV a reasonable opportunity to repair an alleged defect. Plaintiffs,

by their own admission, did not do this. Absent an opportunity to repair, there can be no breach of warranty. As breach of warranty is the predicate of all of Plaintiffs' claims, summary judgment in appropriate as a matter of law.

Defendant's Memorandum in Support (ECF 23), p. 2.

In support of its argument, DRV relies in large part on the case of *Mathews v. REV Recreation Group, Inc.*, 931 F.3d 619 (7th Cir. 2019). In *Mathews*, this Court granted summary judgment in favor of the defendant RV manufacturer on the plaintiffs' breach of warranty claims, concluding that the plaintiffs had failed to present sufficient evidence showing that REV was afforded a reasonable opportunity to repair the many problems the Mathews alleged existed with their RV.[2] The Seventh Circuit affirmed this Court's decision, concluding as follows:

> We are sympathetic to the Mathews; they were sold an RV that had problems from the day that they bought it. But because they have not established that REV breached its express or implied warranties–or any other law–we agree with the district court that their claims fail.

931 F.3d at 624. Both this Court and the Seventh Circuit determined that the evidence failed to establish that the Mathews had afforded REV reasonable opportunities to repair the long list of problems the Mathews alleged existed with their RV, and that this failure was fatal to their claims. The circumstances, and the result, are the same in this case; the Zylstras present plenty of evidence of problems with their RV, but they failed to provide DRV with sufficient opportunity to address those problems. Absent reasonable opportunity to cure, the Zylstras' breach of

---

[2] The Mathews, represented by the same attorneys representing the Zylstras, brought the same claims: state law claims for breach of express and implied warranties, and claims for violations of the IDCSA and the Moss-Magnuson Warranty Act. Despite the Zylstras' attempts to distinguish *Mathews* (*see* Plaintiffs' Response, p. 9), the dispositive issue in both cases is the same: did the defendant have reasonable opportunities to repair the alleged defects? The answer in both cases is also the same: they did not, and the plaintiffs' claims fail to survive summary judgment for that reason.

warranty claims fail.

In *Cimino v. Fleetwood Enterprises*, this Court (Judge Springmann) explained as follows:

In order to prevail on a claim [for breach of warranty], the Plaintiffs have the burden of establishing, by a preponderance of the evidence, five elements: (1) the Plaintiffs complied with the terms of the warranty; (2) the motor home contained a defect covered by the warranty; (3) *the Defendants were given a reasonable opportunity to perform the necessary repairs*; (4) the Defendants were unable to repair the defect within a reasonable time or after a reasonable number of attempts; and (5) the Plaintiffs have suffered damage.

*Cimino v. Fleetwood Enterprises, Inc*., 542 F.Supp.2d 869, 882 (N.D. Ind. 2008) (italics added).

If a plaintiff fails to present sufficient evidence showing that the defendant had reasonable

opportunities to perform repairs and failed to do so, the defendant is entitled to summary

judgment because the plaintiff has failed to establish an element of his claim. *See Marchionna v.

Ford Motor Co.*, 1995 WL 476591, *4 (N.D. Ill. 1995) (holding that "[t]he Magnuson-Moss Act

provides that in the case of a recurrent problem, the warrantor . . . is entitled to make 'a

reasonable number of attempts' to repair the defect before being required to refund or replace the

product or component[]" and that three attempts over a period of 11 months was not sufficient

under the circumstances); *Cimino*, 542 F.Supp.2d 869, n. 4 (citing *Evans v. GMC*, 459 F.Supp.2d

407 (D. Md. 2006) (holding that four opportunities is a reasonable number of attempts to cure);

*Hoopes v. Gulf Stream Coach Inc*., 2017 WL 6884317, at *2 (N.D. Ind. Apr. 13, 2017) (four

repair attempts in five month period constituted reasonable opportunity); *Bordoni v. Forest

River, Inc*., 2020 WL 1821231, at *3 (N.D. Ind. Apr. 10, 2020) (defendant dealer not entitled to

summary judgment where dealer had seven attempts to address the plaintiff's complaint and RV

was out of service for at least 140 days); *Castagna v. Newmar Corp*., 2020 WL 525936, at *5

(N.D. Ind. Feb. 3, 2020) ("the Seventh Circuit has held as a matter of law that even 'two chances

is not a reasonable opportunity to cure the defects[.]'") (quoting *Mathews*, 931 F.3d at 622).

To reiterate, the Zylstras argue that their RV was subject to six repair attempts and was out of service for somewhere between 176 and 232 days. In their Complaint, the Zylstras calculate the number of repair attempts and the amount of time the RV was out of service as follows:

• "The RV went into the factory warranty authorized repair shop on April 29, 2017 for about 22 days[.]" Complaint, ¶ 20.

• "The RV went into the DRV, LLC factory repair shop on June 21, 2017 for about 2 days for repair and replacement of the following defect: Damaged roof." *Id*., ¶ 21.

• "The RV went into the factory warranty authorized repair shop on June 27, 2017 for about 51 days for repair[.]" *Id*., ¶ 22.

• "The RV went into the factory warranty authorized repair shop on September 11, 2017 for about 102 days for repair[.]" *Id*., ¶ 23.

• "The RV went into the factory warranty authorized repair shop on January 26, 2018 for about 1 day for repair of the following defect: Gaskets replaced." *Id*., ¶ 24.

By Plaintiffs' calculations, then, the RV was in a repair shop for some "176 days or more." The Zylstras up the ante in their brief in opposition to summary judgment by insisting that they "presented the RV for repair under DRV's warranty a total of 6 times over a period of *232 days*[.]" Plaintiffs' Brief in Opposition, p. 4 (italics added).

DRV argues that both numbers–176 days and 232 days–are exaggerated and contradicted by the evidence. DRV argues that the Zylstras' calculations as to the number of service visits *and* the duration of those visits are misleading because they include in those calculations visits that had nothing to do with warranty repairs. DRV insists that "Plaintiffs attempt to conflate the amount of time the RV was at dealers with DRV's performance under its warranty. . . . Only the

amount of time attributable to DRV for authorizing and allowing warranty repairs would be
relevant to a discussion of whether DRV performed within a 'reasonable amount of time.'"
Defendant's Reply, pp. 10-11.

DRV argues that the Zylstras' calculation of the number of days the RV was out of
service "is fraught with problems. The first of which is Plaintiffs' contention that the RV was out
of service for '232 days.' It is unclear how this number is calculated[.] . . . But it seems to include
time completely unrelated to warranty repairs such as: (1) the 52 days the RV was at the selling
dealer in storage in March and April 2017 so as to allow the Plaintiffs time to purchase a truck
capable of towing it; and (2) the 21 days the RV was at Bradley Bourbonnais when Plaintiffs
dropped it off without an appointment and no repairs were performed due to the dispute between
Plaintiffs and that dealer." *Id*., p. 10. DRV concludes that "[o]nly the amount of time attributable
to DRV for authorizing and allowing warranty repairs would be relevant to a discussion of
whether DRV performed within a 'reasonable amount of time.'" *Id*., p. 11. Finally, while DRV
acknowledges that the Zylstras took the RV to Plaza RV on two occasions for repair work, the
company argues that "the evidence in this case demonstrates that the time the RV spent at Plaza
RV was not solely related to warranty repairs and so it is inaccurate to count all time at a dealer
as being 'out of service' for warranty repairs." *Id*., p. 12. In short, DRV argues that the Zylstras
are fudging the numbers in order to support their assertion that the RV was out of service for
"232 days."

DRV is correct–the Zylstras' calculations do not hold water. In support of their
calculations, the Zylstras present a written time line they prepared listing what they contend were
the number of times and duration that the RV was serviced. Plaintiffs' Response (ECF No. 28-7).

13

That time line includes periods of time when the RV, while in the custody of either Bradley Bourbonnais, Plaza RV or DRV, was *not* being serviced, and which do not count as opportunities to repair.

The first of those, as DRV points out, is the 52 days the RV was in the custody of Bradley Bourbonnais from about March 6 until April 27. *Id.* The Zylstras include this period of time when calculating the number of days the RV was in for service. *Id.* But as DRV notes, this 52-day period was due to the fact that when the Zylstras purchased the RV on March 6 they did not have a truck capable of towing the RV, and Bradley Bourbonnais stored it for them until they purchased a truck. In his deposition, Bernard Zylstra testified as follows:

Q. What was the game plan as far as delivery of the RV?

A. We did not have a vehicle to tow it at the time, and we discussed with Jerry whether we could store it there for a short period of time . . . .

Q. At that point in time, March 6th, had you already ordered a new truck?

A. No.

Q. And when did you actually take possession of the RV?

A. I think it was the 27th of April. It was the first time we took it off the lot.

Bernard Zylstra Depo. (ECF 23-1), pp. 31-32. Zylstra also testified that during this period of time, he paid to have Bradley Bourbonnais "install a satellite receiver dish[]" but that was not a warranty matter. *Id.*, p. 32. Accordingly, this period of time did not constitute the first "reasonable opportunity" for DRV or its authorized dealer to make any warranty repairs and the Zylstras wrongly include it in their calculation.[3]

---

[3] This fact is also undisputed. In his deposition, Mr. Zylstra testified as follows:

As to the April 29 visit, DRV notes that no repairs–warranty or otherwise–were done to the RV during this visit "[b]ecause of [a] difference of opinion and because of a disagreement over the amount Bradley Bourbonnais proposed to charge to repair the damage [to the roof], no warranty repairs were ever performed by Bradley Bourbonnais." Defendant's Reply, p. 4 (boldface in original). Accordingly, that 22-day period did *not* involve any repair attempts and cannot form the basis for any breach of warranty claim. While the Zylstras had compiled their first list of problems and presented that list to Bradley Bourbonnais when they dropped off the RV on April 27, the dispute about the roof damage–and Bradley Bourbonnais's high estimate for repairing it–resulted in the Zylstras deciding to take the RV directly to the DRV factory for repair of the roof *and* to address their first list of warranty issues. Regarding this visit, Mr. Zylstra testified as follows:

> Q. . . . How did you [and Bradley Bourbonnais] resolve the [roof] issue?
>
> A. Well, it was resolved by–my insurance company just went ahead and covered it through comprehensive.
>
> Q. Did you . . . discuss any of the other repairs that needed to be completed on this List 1?
>
> A. After we had decided to have the factory do the roof repair/roof replacement, we had a little discussion that didn't go well.

_____

> Q. And so prior to your pickup of the RV and ultimate delivery of the RV, is it accurate that Bradley Bourbonnais was also performing repairs to the vehicle to get it ready to deliver to you?
>
> A. Well, we didn't–we hadn't produced any kind of a repair list. The only thing that I do know of is they installed that satellite dish receiver on the top. I don't–I don't know of anything that they were doing in the time that it was stored over there with them other than that.

Bernard Zylstra Depo. (ECF No. 23-1), p. 86.

Q. Tell me about that discussion

A. I had informed [the Bradley Bourbonnais representative] that the factory would be replacing the roof. And he got a little annoyed and said, "Well, they can just take care of the rest of the problems." And I said, "The last I knew they didn't have time. They just had it scheduled for the roof." And that was the last of the discussion, basically.

Q. And was it your sense that he was upset because he wasn't making the money on the roof replacement?

A. Yes, he was. Because he had quoted me twice as much as the factory did.

Q. And so in between, though, you being informed of that damage and that conversation that didn't go well, you had reached out to the factory to have the repairs done at the factory?

A. Correct.

*Id.*, pp. 47-48. It is undisputed, then, that after receiving a high estimate to repair the roof, the Zylstras decided to take the RV to DRV's factory to have the roof repaired *and* to have their first list of alleged problems addressed by DRV. Since Bradley Bourbonnais did not have an opportunity to repair the warranty issues, due to the Zylstra's decision to take the RV to DRV, this visit cannot be the basis for any breach of warranty claim.

The Zylstras also include in their time line an assertion that the RV was out of service for two days in June of 2017 while the roof damage was repaired at DRV. But while the Zylstras and Bradley Bourbonnais had a difference of opinion about the cause of the roof damage, it is undisputed that the damage was not covered by the warranty, and so this work also did not constitute an opportunity to repair warranty items.

After making arrangements in early May, immediately following the disagreement with Bradley Bourbonnais, to have the roof repaired at DRV's factory, the Zylstras delivered it to

16

DRV on about June 21. At that time, the Zylstras learned–for the first time, they assert–that they could take the RV to any authorized DRV dealer to have the warranty items on their first list repaired. The Zylstras decided to take the RV to Plaza RV, an authorized dealer in Iowa that was closer to the Zylstra's home, to have their initial list of warranty issues addressed. The RV remained at Plaza RV from June 27 until August 16, and the Zylstras count this period of time–approximately 50 days–as time the RV was "out of service" for warranty repairs. However, as DRV points out, it is undisputed that "[i]n addition to requesting the warranty repairs, the Zylstras made arrangements for non-warranty work to be performed by Plaza RV, including installation of some after-market items." Defendant's Memorandum, pp.4-5 (citations to record omitted). Thus, not all of that time period was devoted solely to warranty repairs. That fact notwithstanding, this visit to Plaza RV from June to August was the *first* time the Zylstras afforded an authorized repair shop to address their *first* list of problems.

The Zylstras also include in their time line the period of time the RV was at Plaza RV from September 11, 2017, until December 21, 2017. The Zylstras insist that this 102-day period was due to warranty repairs. However, as DRV again correctly notes, the inclusion of this entire period is problematic for two reasons: first, because the work done by Plaza RV included not only the repair (or attempted repair) of warranty items, but also additional, non-warranty work requested by the Zylstras, "including the installation of new entry steps that were unrelated to any warranty issues." Defendant's Memorandum, p. 5 (citing Bernard Zylstra Depo., pp. 63-64). Also, it is undisputed that when the Zylstras delivered the RV to Plaza RV on September 11, they understood that Plaza RV was very busy and would have to keep the RV for a period of time in order to complete the warranty work the Zylstras sought. The Zylstras agreed, telling Plaza RV

17

that they needed the RV back in time for their scheduled trip to Texas in December. Based on that understanding, the RV remained at Plaza RV for about 102 days. Accordingly, DRV correctly asserts that not all of that time is properly included as time "out of service" in the Zylstras' calculations. The Zylstras "told Plaza RV they needed the RV back for their trip to Texas (i.e., by the first of the year)." *Id.*, (citing Bernard Zylstra Depo., pp. 63-64). As DRV notes, "Plaza RV met this deadline and the Zylstras picked up the RV on December 21, 2017." *Id.*, p. 6. So, not all of this time is properly included in the Zylstra's calculation of the amount of time the RV was out of service. Still, this work at Plaza RV *did* constitute a *second* opportunity to make warranty repairs.

It is also undisputed, as DRV points out, that the Zylstras chose to hire a mobile repair technician to clean and replace the valve seals on the "black tank" while the Zylstras were on their trip to Texas in January of 2018. DRV argues that "[t]he Plaintiffs count this mobile technician repair as 'warranty service' but the evidence indicates the Plaintiffs hired the technician and paid him themselves. . . . There is no evidence DRV approved this work under its warranty. Mr. Zylstra's affidavit indicates that DRV later agreed to pay this bill but this contradicts his earlier deposition testimony and ought not to be considered." Defendant's Reply, p. 7, n. 6. The "black tank" is the wastewater holding tank, essentially a portable septic tank. While on their trip to Texas the Zylstras discovered that the seals on the black tank were leaking and causing a smell. They hired a mobile RV technician to service the tank and Mr. Zylstra spoke with a representative of DRV about the issue. Mr. Zylstra testified about this issue, and how it was addressed, in his deposition:

Q. And then you took your trip to Texas between January 1 of '18 and March 7th

of '18; correct?

A. Correct.

Q. And was it during this trip that you had the mobile repair?

A. Yes.

Q. So walk me through the issues with the RV that led to the mobile repair.

A. We did a black tank and gray tank dump about a week after we were there, and shortly after that dump, I started to smell something that I initially thought was maybe a dead rodent in the unit. I had noticed when we did the dump on the black tank, it had been leaking, because I ended up with black tank—when I took the stopper out to hook up the sewage pipe. That went on for quite a while. Probably three weeks or so. . . . [I] [c]alled around to several of the RV dealers to try to find somebody who could work on it, and they recommended this Gabriel Maintenance that would actually come out to the park and work on it there, which they did. . . .

Q. So what did Gabriel do when they came out?

A. What he did was take the valve out, took the seals that are in the valve, cleaned them up, cleaned the valve up, had me go ahead and shut the valve completely, and then he replaced the valve between the two flanges.

Q. And did you pay Gabriel for that repair?

A. Yes.

Q. And did you seek reimbursement of that payment from DRV?

A. I don't believe we have.

Q. Did you ask for it, though?

A. I don't think so. Because the last conversation I had with Greg Weldon [a DRV representative], I don't believe we talked about reimbursement.

Bernard Zylstra Depo. (ECF No. 23-1), pp. 69-71. Mr. Zylstra further testified as follows:

Q. And what did Gabriel tell you as far as further work or repairs that would be needed due to the black tank leak?

A. None.

Q. None. Did he tell you none or he just didn't say anything?

A. Just–well, he just didn't say anything about any further . . .

Q. And after those repairs, did you still have any issues related to that black tank leak?

A. Not directly. Because we didn't use the RV after that.
. . .

Q. And so did you contact anyone about getting the issues resolved?

A. Well, then, in the last conversation I had before we came back from Texas with Greg Weldon, we had discussed some alternatives about repairs and so forth, and I just asked him the question, "Can you guarantee that we can get this thing cleaned up underneath and whatever it takes to"–you know, "Is there some kind of a spray that we could use to make sure that there wasn't any biological problems?" or whatever. And he said that they couldn't guarantee anything. That was basically my cue that we got a bigger problem here.

Q. Did you tell Greg that when you were having that conversation?

A. Yeah. I kind of–we kind of got into a discussion about it, you know, if we can't get this cleaned up, you know, that's a big problem.

Q. And what did Greg tell you?

A. Well, he kind of agreed. You know, there wasn't a whole lot he could–we could say. I mean . . .

Q. At any point in time, did Greg indicate that DRV wasn't willing to attempt to address the smell and the issues?

A. Not that I recall. Just that they couldn't guarantee anything that–as far as cleanup.
. . .

Q. And you took that as a cue and never–or did you ever schedule any kind of repairs with DRV or any dealer to try to address the smell issue or the leak from the tank?

20

A. No. Because I was–I was looking around to try to find some information
on–you know, when we–if you have a spill like that in your RV, what can be done
about it? I don't remember any subsequent conversations with Greg.

Q. Outside of the work that we've talked about, which is principally the two Plaza
RV repairs and the Gabriel mobile visit, did you have anyone perform other
maintenance on the RV that's not reflected on Exhibit 1?

A. Other than the factory, no.

*Id*., pp. 69-76. It is undisputed, then, that the only repair or attempted repair of the black tank

leak. Even though Mr. Zylstra testified that he notified DRV about the problem, he also conceded

that the service by Gabriel's Maintenance was the only time a repair or attempted repair was

done on the black tank.

Finally, Mr. Zylstra testified as follows:

Q. And since February of 2018, when you were talking on the phone with Greg,
have you presented the RV to DRV or any of DRV's authorized dealers for
repairs?

A. No.

Q. And why haven't you either previously or now just taken the RV to get it
fixed?

A. My wife and I were totally disgusted with the outcome of all the attempts to
repair this unit. Because of that, we didn't trust any of them anymore to do the
right thing.

*Id*., pp. 82-83. The Zylstras concede, then, that due to their frustration and lack of faith that DRV

or another authorized dealer could repair all the items the Zylstras claimed were wrong with the

RV, they did not seek any additional service, i.e., did not provide DRV or another authorized

servicer with any other opportunities to repair those items.

This Court echos the sentiment expressed by the Seventh Circuit in *Mathews* when that

Court stated that it "sympathized with the Mathews plight; they bought a lemon." Mathews, 931 F.3d at 619. However, like the Mathews, the Zylstras "have not shown that [Defendant] failed to honor its warranties[.]" For that reason, the Zylstras fail to establish an essential element of their claims: that DRV had a reasonable number of opportunities to address the issues and failed to do so. And, again like the Mathews, the Zylstra's "remaining claims under the IDCSA and Magnuson-Moss Warranty Act, which were based on the same arguments, fail as well." *Mathews*, 931 F.3d at 623. Accordingly, DRV is entitled to summary judgment.

**Plaintiffs' Motion to Strike.**

The Zylstras argue in their motion to strike that DRV, in its reply brief, included "three new arguments and legal theories not contained in its initial brief[]" and moves the Court to strike the portions of DRV's brief discussing those arguments or theories, or "alternatively, grant Plaintiffs leave to submit a sur-reply[.] Plaintiffs' Motion to Strike (ECF No. 35), pp. 1-2. Specifically, the Zylstras contend that DRV "raised the following three (3) new arguments and legal theories regarding: (1) the application of agency law to the issue of 'reasonable time' for repairs, (2) the appropriate choice of law analysis to be applied to Plaintiffs' breach of implied warranty claim, and (3) the viability of Plaintiffs' IDCSA claim." *Id*., pp. 2-3. The Court does not agree with the Zylstra's contention that DRV's arguments are truly "new" and presented for the first time in DRV's reply, with the arguable exception of the discussion of agency law, which did not factor into the Court's analysis. In the end, though, the motion to strike is moot, since none of the allegedly new arguments or theories the Zylstras challenge had any affect on the Court's analysis or conclusion. Accordingly, the motion to strike is denied as moot.

**CONCLUSION**

For the reasons set forth above, the motion for summary judgment filed by Defendant

DRV, LLC is GRANTED and the motion to strike filed by Plaintiffs is DENIED AS MOOT.


Date: May 18, 2020.

　_/s/   William C. Lee_
William C. Lee, Judge
U.S. District Court
Northern District of Indiana